Case 1:22-cv-00011-SPW   Document 6   Filed 02/11/22   Page 1 of 20

FILED
01/18/2022
Terry Halpin
CLERK
Yellowstone County District Court
STATE OF MONTANA
By: Pamela Owens
DV-56-2022-0000040-NE
Davies, Colette B.
1.00

John Heenan
Joseph Cook
Teague Westrope
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Phone: (406) 839-9091
Fax: (406) 839-9092
john@lawmontana.com
joe@lawmontana.com
teague@lawmontana.com

Attorneys for Plaintiffs

**MONTANA THIRTEENTH JUDICIAL DISTRICT COURT, YELLOWSTONE COUNTY**

| | |
|---|---|
| ESTATE OF ROBERT W. PETERSEN, by and through Robert T. Petersen as Personal Representative, | Cause No. |
| Plaintiffs, | Judge |
| Vs. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| KOELSCH SENIOR COMMUNITIES LLC; and BILLINGS PARTNERS, LLC d/b/a CANYON CREEK, | |
| Defendant. | |

COMES NOW Plaintiff, through counsel, and for its complaint alleges:

**INTRODUCTION**

1. This civil action is to recover all damages stemming from the indignity, pain, suffering, and eventual death of Robert W. Petersen (Petersen), who was a resident of Canyon Creek in Billings, Montana from July 2019 to July 2020. Petersen suffered from dementia. Lacking the means to care for himself, he and his family relied upon his caretakers at Canyon Creek. In July 2020, Petersen's family was unable to visit him for

1

several weeks due to the COVID-19 pandemic. When they were finally able to do so, they discovered he had lost a significant amount of weight and was no longer able to talk, swallow, or stand. Petersen's malnutrition and dehydration resulted in hospitalization and untimely hastened an untimely death in September 2020.

## **PARTIES**

2.    Petersen, now deceased, was a resident of Canyon Creek, 1785 Majestic Lane, Billings, Yellowstone County, Montana, from July 2019 to July 2020. He is survived by his wife and adult children. His son, Robert T. Petersen, is the court-appointed Personal Representative of the Estate of Robert W. Petersen.

3.    Defendant Koelsch Senior Communities LLC (Koelsch Communities) is a limited liability company organized and existing under the laws of the State of Washington, with its principal address listed as 111 Market St. NE, Ste 200, Olympia, WA 98501. According to its website, Koelsch Communities operates 35 communities in eight states. Canyon Creek is listed as one of those communities. Koelsch Communities is not registered to do business with the State of Montana.

4.    Defendant Billings Partners, LLC (Billings Partners) is a foreign limited liability company registered to do business with the State of Montana. Its mailing address is listed as 111 Market St. NE, Ste 200, Olympia, WA 98501, the same as for Koelsch Communities. Billings Partners' registration with the State of Montana shows it as being associated with several inactive assumed business names previously registered with the State of Montana, including: Canyon Creek Alzheimer's Community; Canyon Creek Assisted Living Memory Care Community; and Canyon Creek, a Koelsch Senior Community. Those assumed business names all had mailing addresses listed as 111 Market St. NE, Ste 200, Olympia, WA 98501, the same as for Koelsch Communities.

5. Upon information and belief, Billings Partners is a mere alter ego of Koelsch Communities, such that piercing the corporate veil is appropriate. In the alternative, to the extent Defendants are indeed two separate entities, Plaintiff believes that Defendants act in concert to operate Canyon Creek, such that joint liability is appropriate.

6. At all relevant times herein, Defendants' employees and/or agents were acting in the course and scope of their employment.

7. Defendants are vicariously liable for the negligent conduct of their employees and/or agents under the common law doctrine of respondeat superior.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this matter pursuant to Rule 4(b)(1), M.R. Civ. P., and venue is proper in Yellowstone County, Montana.

**KOELSCH COMMUNITIES' MANAGEMENT OF CANYON CREEK**

9. Koelsch Communities is a fast-growing company in the business of standalone memory care.

10. Koelsch Communities' CEO Aaron Koelsch has stated that the company has approximately 100 private investors.

11. In a 2019 interview, while answering a question about how Koelsch Communities defines a healthy margin while striking the right mission/margin balance, Koelsch Communities' CFO Dennis Christianson stated in part, "Trying to balance margin and mission, [CEO Koelsch] would be the first one to tell you, as a leader of a for-profit company, his goal is to make money."

3

12. According to CFO Christianson, the core metric tracked by Koelsch Communities is the company's expenses to revenue. Koelsch Communities strives for an expense-to-revenue ratio of 64% or less, meaning that for every $100 in revenue, Koelsch Communities does not want to exceed $64 in expenses. CEO Koelsch takes a close look at expenses if the company's expense-to-revenue ratio climbs into the high 60s.

13. According to CFO Christianson, labor costs "are huge" and have the biggest effect on expenses. If labor costs are too high, "[it] creates a quick conversation for the regional team." In other words, cuts in staffing are made to increase profit margins.

14. CFO Christianson has also recognized that "[t]urnover is high . . . We think we can do better there with some better training and hiring."

15. Upon this information, Canyon Creek's staffing levels were intentionally insufficient during Petersen's time as a resident to limit expenses and maximize revenue.

16. Upon this information, Canyon Creek's staff were improperly trained and/or improperly experienced during Petersen's time as a resident.

17. Upon this information, and the allegations following, Koelsch Communities made corporate decisions to limit developing and implementing certain infection prevention and control protocols at Canyon Creek during the COVID-19 pandemic to limit expenses and maximize revenue.

18. As of late February 2020, Koelsch Communities was aware of the dangers associated with COVID-19 exposure to residents of its communities and could reasonably foresee that a failure to develop and implement proper infection prevention

4

and control protocols could lead to catastrophic effects on staffing levels throughout its communities, thereby jeopardizing the health and safety of its residents.

19. In late February 2020, Koelsch Communities became aware of the dangers associated with COVID-19 exposure to residents of independent, assisted living, and memory care communities. Around that time, Koelsch Communities' Madison House Independent & Assisted Living Community in Kirkland, Washington accepted two residents from Life Care Center of Kirkland. In late February and early March 2020, Koelsch Communities became aware of the start of a COVID-19 outbreak at Life Care Center of Kirkland located in Kirkland, Washington. Over the next two months, at least 35 deaths related to COVID-19 were linked to Life Care Center of Kirkland. The COVID-19 outbreak at Life Care Center of Kirkland garnered national news as the first major COVID-19 outbreak in a senior care community. As such, Koelsch Communities could reasonably foresee that a failure to develop and implement proper infection prevention and control protocols could lead to catastrophic results in its own communities.

20. On March 9, 2020, Koelsch Communities issued a COVID-19 update on its website stating in part, "The COVID-19 situation has our full attention." Koelsch Communities further stated, "As of Tuesday, February 25, all Koelsch Communities are following the CDC protocols for COVID-19. . ." Koelsch Communities went on to list specific protocols being followed. Koelsch Communities made these representations to help calm the fears and concerns of its residents and their families and to influence their decisions as to whether to continue receiving care and services from Koelsch Communities.

21. On March 13, 2020, Koelsch Communities issued a COVID-19 update on its website stating in part, "The COVID-19 situation is very fluid and changes occur

5

daily, if not hourly. We remain vigilant and on high alert. This situation and the safety of our residents and staff is our highest priority. . . This week, the states of Washington, California, and Texas have issued mandates for enhanced protocols for Long-Term Care Communities. . . These new requirements are the strictest of any state where we operate and we have implemented most of them in all our communities in other states." Koelsch Communities went on to acknowledge that "the new protocols" contained "enhancements" to what was in place throughout its facilities. Koelsch Communities did not elaborate or explain why it did not choose to develop and implement the new protocols in all of its communities, regardless of whether it was mandated to do so by various state laws. Koelsch Communities made these representations to help calm the fears and concerns of its residents and their families and to influence their decisions as to whether to continue receiving care and services from Koelsch Communities.

22. On March 27, 2020, Koelsch Communities represented to its residents and staff that it was undertaking aggressive steps toward COVID-19 infection control, "We continue to follow all state mandates and CDC guidelines in all of our communities and we have comprehensive plans in place not only to protect our residents and employees but also to continue providing the best quality of life possible for our staff and residents." Koelsch Communities made these representations to help calm the fears and concerns of its residents and their families and to influence their decisions as to whether to continue receiving care and services from Koelsch Communities.

23. On April 8, 2020, Koelsch Communities issued a COVID-19 update on its website advising that an employee of one its communities had tested positive for COVID-19, and that a resident of another facility had tested positive for COVID-19. Koelsch Communities went on to state, "We continue to closely monitor residents and

6

screen every person entering our community, including our dedicated and caring staff." Koelsch Communities made these representations to help calm the fears and concerns of its residents and their families and to influence their decisions as to whether to continue receiving care and services from Koelsch Communities.

24. During the following days, weeks, and months, Koelsch Communities continued to issue regular COVID-19 updates on its website apprising the public of positive tests throughout its communities.

25. Meanwhile, Defendant also continued making representations concerning its purported vigilance and safety protocols. For instance, assurances were made that "[any] resident who is symptomatic or tests positive is isolated and cared for by staff using all precautions recommended by the CDC and local health department[s]." Koelsch Communities made these representations to help calm the fears and concerns of its residents and their families and to influence their decisions as to whether to continue receiving care and services from Koelsch Communities.

26. On April 22, 2020, Koelsch Communities issued a COVID-19 update on its website stating in part, "Since the beginning of the COVID-19 outbreak, we have been in close communication with local health departments in the areas where our communities are located. At both Cascade Inn in Vancouver, Washington, and Cedar Creek in Edmonds, Washington, health department officials have recommended and offered to conduct wide-spread testing of both residents and employees. We welcome these tests and are working to ensure that they are conducted quickly and completely." Despite accepting government testing in Washington, Koelsch Communities would go on to decline free government testing for Canyon Creek.

27. As of April 30, 2020, Koelsch Communities had significant COVID-19 outbreaks in two of its communities. At Cedar Creek in Edmonds, Washington, 14 residents and eight staff were positive. And at Northbrook Inn in Northbrook Illinois, 10 residents and seven staff were positive. However, by May 14, 2020, neither community had positive cases. Koelsch Communities' relative success to this point at minimizing infection spread within its communities is evidence that Koelsch Communities was capable of doing so, yet because enhanced protocols were apparently not developed and implemented universally in all of its communities, Koelsch Communities continued to jeopardize the health and safety of its residents and staff at Canyon Creek.

28. By May 26, 2020, a new COVID-19 outbreak was occurring in Koelsch Communities' Waverly Inn at Arlington Heights, Illinois, where 16 residents and five staff had tested positive.

29. By June 7, 2020, another COVID-19 outbreak was occurring in Koelsch Communities' Meadowbrook in Arlington, Texas, where 30 residents, approximately 41% of all residents, and 11 staff had tested positive.

30. By June 25, 2020, yet another COVID-19 outbreak was occurring in Koelsch Communities' Arbor Hills in Plano, Texas, where 25 residents, approximately 89% of all residents, and 11 staff had tested positive.

31. On July 7, 2020, Koelsch Communities issued a COVID-19 update on its website advising of an outbreak at Canyon Creek. According to its statement, Koelsch Communities advised that as of July 3, 2020, 43 of its 59 residents, or 73% of all residents, and 15 staff had tested positive. At that time, Koelsch Communities was awaiting test results for nine residents, and only seven residents had tested negative. By July 20, 2020, three additional residents and eight additional staff had tested positive.

8

32. On July 7, 2020, Governor Steve Bullock advised media that Canyon Creek was among a minority of long-term care and assisted living facilities in Montana that had declined participation within the State's free testing program.

33. On July 10, 2020, because of the effect of the COVID-19 outbreak on Canyon Creek staff, the State of Montana had to deploy troops from the Montana National Guard to help provide care to Canyon Creek residents.

34. On July 21, 2020, Koelsch Communities' Chief Operating Officer Eva Arant addressed questions with the Montana media concerning the COVID-19 outbreak at Canyon Creek. Arant defended the decision to not participate in the State's free testing program. She further stated in part, "We have put in place policies and procedures that we feel have protected our residents."

35. Arant's comments to the Montana media, along with the comments made on Koelsch Communities' website, show that Koelsch Communities exercises control over Canyon Creek's operation and care and services to residents.

**PETERSEN'S CARE AT CANYON CREEK**

36. Petersen became a resident of Canyon Creek in July 2019. Other than Parkinson's disease and Parkinson's disease dementia, he had no other significant health conditions.

37. Petersen's daughter, Misty Mitchell (Mitchell), provided supplemental care and services to him at Canyon Creek. She assisted Petersen with his activities of daily living and served as an onsite advocate for Petersen to receive better care and services from Canyon Creek.

38. Mitchell observed and documented instances of neglect and mistreatment by Canyon Creek, including, but not limited to: staff not regularly assisting Petersen

9

with going to the bathroom; staff not regularly assisting Petersen with proper grooming and bathing; and staff making changes to Petersen's medications without first receiving permission from Petersen's healthcare power of attorney.

39. On June 27, 2020, the last day Mitchell visited Petersen before Canyon Creek experienced a COVID-19 outbreak, Petersen was well nourished, sufficiently hydrated, and able to assist with his activities of daily living.

40. On July 1, 2020, Mitchell was prevented from entering Canyon Creek. The head nurse advised her that a resident had tested positive for COVID-19 on June 30, 2020.

41. On July 8, 2020, Canyon Creek advised Petersen's family that he had tested positive for COVID-19 but was asymptomatic.

42. On July 23, 2020, Mitchell visited Petersen for the first time since June 27, 2020. She found him soaked in his own urine. Mitchell observed that Canyon Creek was short-staffed, and that staff were not checking on Petersen regularly. Additionally, she observed that Petersen had lost a considerable amount of weight and was no longer able to talk, swallow, or stand. Mitchell asked Canyon Creek staff to weigh Petersen, but Canyon Creek staff advised Mitchell they were no longer weighing residents due to COVID-19 protocols.

43. On July 24, 2020, Mitchell observed signs that Petersen was severely dehydrated. A nurse confirmed that he was indeed dehydrated. However, Canyon Creek staff advised Petersen's wife, and healthcare power of attorney, that he did not need to be transported to the hospital. Canyon Creek's head nurse acknowledged that Petersen could benefit from intravenous fluids but said that so too could all of Canyon Creek's residents.

44. On July 25, 2020, Petersen developed a fever. In addition, his heart rate was high, but his blood pressure was low. He was therefore transported to the hospital. At the hospital, Petersen's family was told to say their goodbyes because Petersen was not expected to survive. Hospital staff advised that Petersen was suffering from an infection and renal failure. Hospital staff further discovered that Petersen had been suffering from pressure injuries on his hip and coccyx.

45. Over the next 10 days, Petersen's condition stabilized enough to be discharged from the hospital and placed under hospice care in accordance with the conditions of his living will. He never recovered and passed away on September 18, 2020.

## COUNT I: NEGLIGENCE

46. Plaintiff incorporates all preceding paragraphs as if set forth herein.

47. On its website, Koelsch Communities represents in part, "Our dementia care communities and specially trained staff members focus solely on the care of each person, no matter the level of care needed." Koelsch Communities further represents that its services cater to those with a diagnosis of dementia, and that Koelsch Communities provides 24/7 on-site nurses.

48. Defendants assumed a duty to provide care and services to Petersen, through specially trained staff, focused solely on his care and catered to his dementia.

49. Defendants breached their duty to Petersen by failing to ensure that he received sufficient nutrition and hydration.

50. The issue of whether Defendants provided sufficient nutrition and hydration to Petersen is not an issue beyond the common experience of triers of fact,

such that expert testimony is necessary to assist the triers of fact in understanding the evidence or determining an issue.

51. Defendants' failure to ensure that Petersen received sufficient nutrition and hydration constitutes negligence, or in the alternative gross negligence.

52. As a direct and proximate result of Defendants' negligence, or in the alternative gross negligence, Petersen suffered from malnutrition and dehydration, which deteriorated his health, caused him pain, suffering, and mental anguish, and ultimately hastened his untimely death.

53. As a direct and proximate result of Defendants' negligence, or in the alternative gross negligence, Petersen's wife and adult children have suffered loss of consortium, loss of companionship, and loss of comfort and society.

### **COUNT II: NEGLIGENCE / NEGLIGENCE PER SE**

54. Plaintiff incorporates paragraphs 2-45 as if set forth herein.

55. Canyon Creek is a licensed assisted living facility under Montana law.

56. Administrative Rule of Montana § 37.106.2828 mandates that all licensed assisting living facilities shall comply with the Montana Long-Term Care Residents' Bill of Rights found in Montana Code Annotated § 50-5-1101, et seq.

57. Montana Code Annotated § 50-5-1104(1) adopts the rights guaranteed by the Federal Nursing Home Reform Act (FNHRA) set forth in 42 U.S.C. § 1396 et seq. and implemented through federal regulation.

58. Defendants owed Petersen duties of care attendant with the following rights:

    a. Petersen had the right to a dignified existence. 42 C.F.R. § 483.10(a).

12

b. Petersen had the right to be treated with respect and dignity and care in a manner and in an environment that promoted maintenance or enhancement of his quality of life. 42 C.F.R. § 483.10(a)(1).

c. Petersen had the right to equal access to quality care regardless of his diagnosis or the severity of his condition. 42 C.F.R. § 483.10(a)(2).

d. Petersen had the right to receive services with reasonable accommodation of his needs. 42 C.F.R. § 483.10(e)(3).

e. Petersen had the right to be free from neglect. 42 C.F.R. § 483.12.

f. Petersen, through his representative, had the right to be informed of, and participate in, his treatment plan, including the right to be informed, in advance, of changes to his treatment plan. 42 C.F.R. § 483.10(c).

g. Petersen, through his representative, had the right to be immediately informed of a significant change in his physical, mental, or psychosocial status. 42 C.F.R. § 483.10(g)(14).

59. Defendants breached their duties of care by:

a. Failing to provide Petersen with the necessary services to maintain good grooming and personal and oral hygiene, as required by 42 C.F.R. § 483.24(a)(2) and ARM 37.106.2843(1);

b. Failing to have sufficient nursing staff, with the appropriate competencies and skill sets, to provide Petersen with nursing and related services for him to attain or maintain the highest practicable physical, mental, and psychosocial well-being, as required by 42 C.F.R. § 483.35 and ARM 37.106.2816;

13

    c. Failing to ensure that Petersen maintain acceptable parameters of nutrition and hydration, as required by 42 C.F.R. § 483.25(g);

    d. Failing to ensure that Petersen receive care, consistent with professional standards of practice, to prevent development of a pressure injury, as required by 42 C.F.R. § 483.25(b)(i) and ARM 37.106.2843(4);

    e. Failing to notify Petersen's representatives that he had become malnourished and dehydrated, as required by 42 C.F.R. § 483.10(g)(14);

    f. Failing to notify Petersen's representative that he had could not talk, swallow, or stand, as required by 42 C.F.R. § 483.10(g)(14); and

    g. Failing to notify Petersen's representative that he had developed a pressure injury, as required by 42 C.F.R. § 483.10(g)(14).

60. The foregoing statutes and regulations were established to recognize the fundamental civil and human rights to which residents of assisted living are entitled.

61. As a resident of Canyon Creek, Petersen was entitled to the foregoing civil and human rights.

62. Petersen suffered injuries of the sort which the foregoing statutes and regulations were enacted to prevent.

63. The foregoing statutes and regulations are intended to regulate Defendants as owners and operators of Canyon Creek.

64. Defendants' acts/omissions constitute negligence, gross negligence, or negligence per se.

65. As a direct and proximate result of Defendants' negligence, gross negligence, or negligence per se, Petersen suffered, in isolation, from malnutrition, dehydration, pressure injuries, and infection, all of which deteriorated his health, caused him pain, suffering, and mental anguish, and ultimately hastened his untimely death.

66. As a direct and proximate result of Defendants' negligence, gross negligence, or negligence per se, Petersen's wife and adult children have suffered loss of consortium, loss of companionship, and loss of comfort and society.

## COUNT III: NEGLIGENT MANAGEMENT

67. Plaintiff incorporates all preceding paragraphs as if set forth herein.

68. Defendants assumed a special relationship with Petersen, who was cognitively impaired, and therefore owed him a nondelegable duty to operate and provide services at Canyon Creek in compliance with all applicable industry standards, statutes, and regulations.

69. Defendants breached this nondelegable duty by:

   a. Failing to ensure that Canyon Creek's direct care staff had knowledge of Petersen's needs; and

   b. Failing to provide a sufficient number of qualified staff on duty 24 hours a day at Canyon Creek to meet Petersen's scheduled and unscheduled needs;

70. Defendants' failures in the preceding paragraph constitute negligent management, or in the alternative grossly negligent management.

71. As a direct and proximate result of Defendants' negligent management, or in the alternative grossly negligent management, Petersen suffered, in isolation, from

malnutrition, dehydration, pressure injuries, and infection, all of which deteriorated his health, caused him pain, suffering, and mental anguish, and ultimately hastened his untimely death.

72. As a direct and proximate result of Defendants' negligent management, or in the alternative grossly negligent management, Petersen's wife and adult children have suffered loss of consortium, loss of companionship, and loss of comfort and society.

### COUNT IV: NEGLIGENT MISREPRESENTATION

73. Plaintiff incorporates paragraphs 2-45 as if set forth herein.

74. Defendants, in the course of their businesses, represented that they would provide Petersen with specially trained staff members focused solely on his care, no matter the level of care he needed. Defendants made these representations to influence Petersen and his family to choose Canyon Creek for Petersen's care.

75. Defendants, in the course of their businesses, represented that they would provide services catered to Petersen's dementia, including specific care techniques and 24/7 on-site nurses. Defendants made these representations to influence Petersen and his family to choose Canyon Creek for Petersen's care.

76. Defendants, in the course of their businesses, represented that they were being vigilant and were on high alert with respect to the COVID-19 pandemic, and that their highest priority was the safety of their residents. Defendants made these representations to calm the fears and concerns of their residents and their representatives, and to influence decisions as to whether residents should remain in Defendants' care.

77. Defendants failed to exercise reasonable care or competence in making these representations.

78. These representations were material.

79. Petersen and his representatives relied upon these representations.

80. As a direct result of Defendants' misrepresentations, Petersen's representatives chose to place Petersen in Canyon Creek.

81. As a direct result of Defendants' misrepresentations, Petersen's representatives chose to keep Petersen at Canyon Creek despite the COVID-19 pandemic.

82. As a direct and proximate result of Defendants' misrepresentations, Plaintiff suffered pecuniary loss, including: the contract fees paid to Canyon Creek while Petersen was a resident at Canyon Creek; the hospital and hospice bills for which Petersen was responsible July 24, 2020 and thereafter; and Petersen's funeral expenses.

### COUNT V: VIOLATION OF THE MONTANA CONSUMER PROTECTION ACT (Mont. Code Ann. § 30-14-101 et seq.)

83. Plaintiff incorporates paragraphs 2-45 and 73-82 as if set forth herein.

84. The Montana Unfair Trade Practices and Consumer Protection Act of 1973, set forth in Mont. Code Ann. § 30-14-101 et seq., prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

85. Petersen and his representatives were consumers pursuant to the Montana Unfair Trade Practices and Consumer Protection Act of 1973.

86. Defendants engaged in unfair and/or deceptive acts or practices in the conduct of their commerce or trade; specifically, Defendants misrepresented to Petersen and his family the scope of Defendants' abilities and services.

87. As a direct and proximate result of Defendants' unfair and/or deceptive acts or practices, Plaintiff suffered pecuniary loss, including: the contract fees paid to

Canyon Creek while Petersen was a resident at Canyon Creek; the hospital and hospice bills for which Petersen was responsible July 25, 2020 and thereafter; and Petersen's funeral expenses.

## COUNT VI: VIOLATION OF THE RIGHT TO DIGNITY
### (Art. II, § 4 of the Montana Constitution)

88. Plaintiff incorporates paragraphs 2-72 as if set forth herein.

89. Article II, § 4 of the Montana Constitution states, "The dignity of the human being is inviolable."

90. Defendants' treatment of Petersen degraded and demeaned him as a person, failed to acknowledge his worth as a human being, and directly violated his constitutional right to dignity.

91. As a direct and proximate result Defendants' violation of Petersen's constitutional right to dignity, Petersen suffered, in isolation, from malnutrition, dehydration, pressure injuries, and infection, all of which deteriorated his health, caused him pain, suffering, and mental anguish, and ultimately hastened his untimely death.

## COUNT VII: PUNITIVE DAMAGES

92. Plaintiff incorporates all previously plead allegations as if set forth herein.

93. Defendants are guilty of actual malice as defined in Mont. Code Ann. § 27-1-212(2). Defendants deliberately acted in conscious or intentional disregard of the high probability of injury to Petersen or otherwise proceeded to act with indifference to the high probability of injury to Petersen.

94. Defendants knew Petersen suffered from dementia and was entirely reliant upon their care and services.

95. Defendants knew of the COVID-19 pandemic.

96. Defendants knew that an outbreak of COVID-19 in Canyon Creek could result in a strain upon or shortage of qualified staff to provide care and services catered to Petersen's dementia.

97. Defendants chose not to develop and implement enhanced infection prevention and control protocols at Canyon Creek with the intent of limiting expenses and maximizing revenue.

98. The COVID-19 outbreak had a significant impact on Canyon Creek's ability to provide Petersen with qualified staff to provide care and services catered to his dementia.

99. As a proximate cause of Defendants' failure to provide Petersen with qualified staff to provide care and services catered to his dementia, Petersen suffered malnutrition, dehydration, pressure injuries, and infection, all of which deteriorated his health and hastened his death.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests a judgment against Defendants as follows:

100. To pierce the corporate veil or to otherwise find that Defendants acted in concert to operate Canyon Creek;

101. For compensatory damages attendant to a survival action, in an amount to be proven at trial;

102. For compensatory damages attendant to a wrongful death action, in an amount to be proven at trial;

103. For pecuniary losses;

104. For treble damages and attorneys' fees pursuant to Montana Unfair Trade Practices and Consumer Protection Act of 1973;

105. For punitive damages, in an amount to be proven at trial;

106. For costs and pre and post-judgment interest, as determined by the Court; and

107. For any and all further legal or equitable relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

108. Plaintiff demands a trial by jury in this matter.

Dated this 18th day of January 2022.

                                                  */s/ John Heenan*
                                                  John Heenan